## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DANIEL BRUNETTE,

      Petitioner,

v.                                Case No. 8:20-cv-916-CEH-CPT

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Daniel Brunette, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Respondent filed a response opposing the petition. (Doc. 11.) Brunette filed a reply. (Doc. 14.) Upon consideration, the petition will be **DENIED**.[1]

## I.    Procedural History

A state-court jury convicted Brunette of second-degree murder with a firearm. (Doc. 12-1, Ex. F.) The state trial court sentenced Brunette to life imprisonment, and the state appellate court *per curiam* affirmed the conviction and sentence. (*Id.*, Exs. I, R.) Brunette subsequently sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Exs. U, V.) The state trial court denied Brunette's claims, and

---

[1] Following the completion of briefing, Brunette filed a motion requesting a ruling on his petition. (Doc. 24.) The Court grants the motion to the extent that this order resolves Brunette's petition.

the state appellate court *per curiam* affirmed the denial of relief. (Doc. 12-2, Exs. Y, Z, AA, KK, VV, WW, AAA.) This federal habeas petition followed. (Doc. 1.)

## II.    Facts; Trial Testimony[2]

On June 4, 2014, Brunette met Darius Hampton at a trailer park in Brooksville, Florida. Brunette later testified that he had never encountered Hampton before that day. Brunette asked for a ride to a gas station so that he could buy cigarettes; Hampton agreed to give him a ride. Later that day, after the two had returned to the trailer park, Brunette asked Hampton for another ride, this time to his friend Larry Wilson's house. The two drove to the house, but Wilson was not there.

On the way back to the trailer park, Brunette mentioned that Wilson was a drug dealer. At this point, according to Brunette, Hampton proposed robbing Wilson and Kevin Kotwica, another friend of Brunette's. Brunette allegedly responded that he "didn't rob [his] friends." (Doc. 12-1, Ex. C, p. 506.) At this point, Hampton "pulled off on a side road," parked the car, and turned on the dome light. (*Id.*, p. 507.) Brunette testified that Hampton pointed a .38 caliber revolver at him and said, "[G]ive me your wallet and give me your freaking money or I'm going to kill you." (*Id.*, p. 508.) According to Brunette, he tossed his wallet and some cash to Hampton, then grabbed the revolver with both of his hands. A struggle allegedly ensued, during which Brunette "headbutt[ed]" Hampton. (*Id.*, pp. 509-10.) Once Brunette got hold of the revolver, he shot Hampton five times, killing him.

---

[2] This summary is based on the trial transcript.

The state medical examiner testified at trial. She explained that Hampton had suffered "five gunshot wounds"—one on the "right side of the back of the head," two on the chest, one on the "right upper arm," and a "superficial graze" beneath the left nipple. (*Id.*, pp. 341, 351.) The medical examiner stated that the wound on the back of the head was a "contact gunshot wound," meaning that "the gun was against the skin when it was fired." (*Id.*, p. 345.) The trajectory of the bullet was "[e]ssentially downward." (*Id.*, p. 357.) The two wounds on Hampton's chest were also contact wounds. (*Id.*, pp. 347, 349.) Finally, the medical examiner testified that Hampton did not have any defensive wounds, such as "injuries on the arms and legs," and that other than the gunshot wounds, "there were no other injuries to indicate a struggle." (*Id.*, p. 358.)

After the shooting, Brunette drove around for "a long period" with Hampton in the passenger seat. (*Id.*, p. 526.) Brunette eventually put Hampton in the trunk, then drove to Kotwica's house. Brunette asked Kotwica to "ride with him"; Kotwica told Brunette he wanted to go to a gas station to buy cigarettes. (*Id.*, pp. 59-60.) Brunette made Kotwica sit in the back seat "[b]ecause there was blood on the [front] passenger seat." (*Id.*, p. 528.) After purchasing cigarettes, the pair drove back to Kotwica's house. Brunette stayed in the house for approximately fifteen minutes before leaving to "go somewhere else." (*Id.*, p. 64.) At no point did he tell Kotwica that he had shot Hampton.

Next, Brunette drove to Dade City, where he sold Hampton's "second gun"— a TEC-22 that was "right next to [the driver's] seat"—for $80 and "a little bit of

methamphetamine." (*Id.*, p. 453.) Brunette then made his way to Wilson's house, arriving at approximately 2:30 a.m. Wilson told him to leave because "it was not the right time" to talk, but Wilson said he could "come back if he wanted to." (*Id.*, pp. 98-99.) Brunette returned at around 10:00 a.m. He told Wilson he "had a body in the trunk," explaining that he had killed Hampton with the latter's revolver during "an altercation." (*Id.*, pp. 100, 102.) After giving Wilson the revolver, Brunette claimed that "he was defending himself," and that "he was doing it for his friends." (*Id.*, pp. 102, 105.) Wilson told Brunette to call the police, but Brunette "didn't want to." (*Id.*, p. 106.) Brunette then indicated that he wished to sell Hampton's car. He also asked Wilson "to take him to the woods, somewhere where he could bury the body."[3] (*Id.*)

Before leaving for the woods, Brunette placed Hampton's belongings—including his driver's license and credit cards—in a burn pit in Wilson's yard. Although Brunette did not set fire to the items, he later told law enforcement that he "was going to burn" them. (*Id.*, pp. 455-56.) Next, Brunette retrieved a shovel and entered Hampton's car. Wilson got in his own car and led Brunette to a wooded area in Hernando County. On the way there, Wilson called the police, described the situation, and "told them that [he] would meet them at [a nearby] church and give them the firearm and the location" of the body. (*Id.*, p. 111.) Brunette buried the body in the woods by himself, pouring brake fluid over the corpse to disguise the "smell." (*Id.*, p. 174.)

---

[3] By contrast, Brunette testified that Wilson gave him the idea of burying the body. (Doc. 12-1, Ex. C, p. 536.)

Law enforcement apprehended Brunette as he returned to Wilson's residence. Police searched Brunette and found five shell casings in his pocket; subsequent analysis established that the casings came from the revolver Brunette had used to shoot Hampton. Shortly after he was apprehended, Brunette led police to Hampton's body.

## III.   Standards of Review

### A.   AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Brunette's conviction, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### B.    Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of

the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

### C.   Ineffective Assistance of Counsel

Brunette alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id.* at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Brunette must show that counsel's alleged error prejudiced the defense, because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, Brunette must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

## IV.    Discussion

### A.    Ground One

Brunette contends that the trial court violated his right to due process by denying his motion for judgment of acquittal. He argues that the "testimonial evidence" presented at trial was "inconclusive and cannot be said to be sufficient in law to satisfy the charged elements of second-degree murder." (Doc. 1, p. 5.)

Respondent maintains that Brunette failed to exhaust Ground One because he did not alert the state appellate court to the federal nature of his claim. The Court disagrees. To properly exhaust a claim, a petitioner "must fairly present [the] claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Id.* at 32. "[A] petitioner need not use magic words or talismanic phrases to present his federal claim to the state courts." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 457 (11th Cir. 2015). "Ultimately, to exhaust state remedies fully[,] the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Id.*

On direct appeal, Brunette argued that the trial court violated the "due process clause of the United States Constitution" by denying his motion for judgment of acquittal. (Doc. 12-1, Ex. P, pp. 9-12.) Citing federal authority, he explained that the

"due process clause protects beyond reasonable doubt of [*sic*] every fact necessary to constitute [the] crime with [which] [he] is charged." (*Id.*, pp. 9-10.) Brunette also stated "[t]he 5th USCA Amendment requires proof beyond a reasonable doubt of every element of a charge." (*Id.*, p. 11.) Thus, Brunette's appellate brief was sufficient to "put the state court on notice that he intended to raise a federal [due process] claim." *Preston*, 785 F.3d at 457; *see also McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (noting that "the purpose underlying the exhaustion requirement" is "to afford the state courts a meaningful opportunity to consider" the federal claim).

Although Brunette fairly presented Ground One in state court, he is not entitled to relief because he cannot show that the rejection of his claim was objectively unreasonable. Under the Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a court reviewing a challenge to the sufficiency of the evidence must evaluate whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. Under *Jackson*, the prosecution does not have "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 326. If the record contains facts supporting conflicting inferences, the jury is presumed to have "resolved any such conflicts in favor of the prosecution." *Id.*

Consistent with AEDPA, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal

court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Brunette fails to show that the state court's rejection of his sufficiency challenge was "objectively unreasonable." *Id.* As noted above, Brunette was charged with second-degree murder with a firearm. Second-degree murder is "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." Fla. Stat. § 782.04(2). "[A]n act is imminently dangerous to another and evinces a 'depraved mind' if it is an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another; and (2) is done from ill will, hatred, spite[,] or an evil intent; and (3) is of such a nature that the act itself indicates an indifference to human life." *Antoine v. State*, 138 So. 3d 1064, 1073 (Fla. 4th DCA 2014). "The requisite intent must generally be inferred from the circumstances and may be demonstrated by the defendant's conduct before and after his use of deadly force." *Finch v. State*, 299 So. 3d 579, 580 (Fla. 1st DCA 2020).

Viewed "in the light most favorable to the prosecution," the evidence at trial was sufficient to prove second-degree murder beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. There is no dispute that Brunette killed Hampton by shooting him five times with a revolver. The question is whether the prosecution presented sufficient

11

evidence that Brunette "acted with a depraved mind." *Perez v. State*, 187 So. 3d 1279, 1282 (Fla. 1st DCA 2016). The answer to that question is yes.

First, the medical examiner testified that Hampton suffered five gunshot wounds—one of which was a contact wound on the "right side of the back of the head." (Doc. 12-1, Ex. C, p. 341.) This meant that "the gun was against the skin when it was fired." (*Id.*, p. 345.) The two gunshot wounds on Hampton's chest were contact wounds as well. Furthermore, the medical examiner opined that Hampton did not have any defensive wounds, such as "injuries on the arms and legs," and that other than the gunshot wounds, "there were no other injuries to indicate a struggle." (*Id.*, p. 358.) A rational jury could infer from this evidence that Brunette and Hampton were not engaged in a struggle when the shooting occurred, and that Brunette simply pointed a loaded gun at Hampton's head and fired. "[P]ointing a loaded gun at the head of the victim and then firing has frequently been held to be an act imminently dangerous to another and evincing a depraved mind regardless of human life." *Jacobson v. State*, 248 So. 3d 286, 288 (Fla. 1st DCA 2018).

Second, Brunette's "actions after the shooting also reflect the requisite intent to support a second-degree murder conviction." *Holmes v. State*, 278 So. 3d 301, 305 (Fla. 1st DCA 2019). After Hampton was shot, Brunette did not call 911 or drive to a hospital. Instead, he sold one of Hampton's guns for $80 and some methamphetamine, placed the victim's belongings in a burn pit, and buried the body in the woods. "These actions support a finding that [Brunette] possessed ill will, hatred, spite, or evil intent towards the victim and that the shooting was no accident." *Id.*; *see also Morales v. State*,

251 So. 3d 167, 172 (Fla. 4th DCA 2018) (defendant's "conduct after the murder d[id] not comport with his contention that he was justified in killing [the victim] in self-defense" because, among other things, "[h]e did not call the authorities" after the shooting, and instead "drove to a remote location and burned the vehicle and body"); *Bogart v. State*, 114 So. 3d 316, 318 (Fla. 4th DCA 2013) (trial court in second-degree murder case "properly denied [] motion for judgment of acquittal" based on "events that transpired after the victim's death," including that defendant "moved her body to the bedroom and covered her with a sheet and stuffed animals," "fled the house without calling 911," and "destroyed one cell phone and sold another cell phone").

Third, although Brunette testified that he killed Hampton in self-defense, the jury was not required to accept his version of events. *See Conklin v. Schofield*, 366 F.3d 1191, 1200-01 (11th Cir. 2004) (noting that "[t]he jury was entitled to discredit [petitioner's] testimony" that "he killed [the victim] in self-defense"). Indeed, "[t]he jury's decision not to believe [Brunette's] version of the events is supported by" the evidence recounted above.[4] *Id.*

Because a rational jury "could have found the essential elements of the crime beyond a reasonable doubt," the state court did not act unreasonably in denying Brunette's motion for judgment of acquittal. *Jackson*, 443 U.S. at 319. Thus, Ground One is denied.

---

[4] The evidence was also sufficient to support the jury's finding that, "[d]uring the commission of the offense, [Brunette] discharged a firearm, and in doing so, caused the death of [] Hampton." (Doc. 12-1, Ex. F.)

**B.    Ground Two**

Brunette argues that trial counsel was ineffective for failing to file a pretrial motion to dismiss based on Fla. Stat. § 776.032, Florida's stand-your-ground statute. He contends that counsel "had sufficient evidence" to file such a motion, but that counsel failed to do so as part of a "do-nothing strategy." (Doc. 1, p. 7.)

Following an evidentiary hearing, the state court denied this claim. The court first recounted the testimony given by Brunette and his counsel at the hearing:

> The Defendant testified at the evidentiary hearing that he was unaware at the time his case went to trial that there was even the possibility of counsel filing a motion seeking immunity from prosecution, under Fla. Stat. § 776.032[;] however[,] he claims that he told his attorney that the death of the victim was the result of self-defense. Furthermore, he makes a broad claim that during the course of counsel's representation of the Defendant[,] he only saw his attorney one (1) time outside of court, for a period of approximately thirty (30) minutes.

> [Trial counsel] testified at the evidentiary hearing. [Counsel] is employed by the Office of Regional Counsel and has been licensed and practicing criminal law since 1991. He testified that during the course of his representation he met with the Defendant somewhere between ten (10) and twenty (20) times, at the Hernando County Jail, and that each time he met with the Defendant they spent a couple hours together discussing the case. [Counsel] testified that he discussed Stand Your Ground (SYG) with the Defendant and advised him that he did not believe it was a viable strategy because the facts, as told to counsel by the Defendant, were that there was struggle between the Defendant and the victim, and the gun went off—fatally wounding the victim. The Defendant did not admit that he intentionally shot the victim. Counsel also stated that he did not feel that filing a SYG motion was a good trial strategy because it would have revealed their strategy and what their defense was going to look like at trial. Furthermore, he could not have pursued SYG without calling the Defendant as a witness at the hearing. If the Defendant testified at the SYG hearing, the Defendant would have effectively waived his right not to testify at trial, because at trial the SYG testimony would have been substantive evidence the State could have used against the Defendant. Furthermore, counsel testified (and the trial record reflects) that at the

conclusion of the State's case, counsel moved for Judgement of Acquittal based on self-defense. The Court denied the motion finding that there was sufficient evidence presented from which the jury could find favorably for the State. The Court did however instruct the jury as to justifiable use of deadly force, by giving the self-defense instruction.

(Doc. 12-2, Ex. AA, pp. 3-4 (record citations omitted).)

The court ultimately rejected Brunette's ineffective-assistance claim on the grounds that he had failed to establish deficient performance:

> Based on the testimony of [trial counsel], which the Court finds credible, it is clear that [counsel] considered SYG in evaluating how best to represent the Defendant against the charge in question. [Counsel] made an intentional decision not to motion the court for immunity from prosecution under Fla. Stat. §775.032, not only because he did not think the motion would be viable, but because he did not want to reveal the defense strategy before trial. The Court finds no deficiency in counsel's representation with regard to this matter. Therefore, the Defendant shall not be afforded any relief predicated on this ground.

(*Id.*, p. 4.)

The state court reasonably rejected Brunette's ineffective-assistance claim. As an initial matter, the state court credited trial counsel's testimony about his decision to forgo filing a stand-your-ground motion. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). Brunette has not shown by "clear and convincing evidence" that the state court's credibility determination was erroneous. 28 U.S.C. § 2254(e)(1). To the contrary, the state court accurately summarized the testimony Brunette and trial counsel gave at the evidentiary hearing. Thus, Brunette has failed to establish that the denial of his

ineffective-assistance claim rested on "an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

Nor has Brunette shown that the state court unreasonably applied *Strickland* in rejecting his ineffective-assistance claim. "There is a strong presumption that counsel's performance falls within the wide range of professional assistance[;] the [petitioner] bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. It is "a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 911 (11th Cir. 2011). "[I]t is rarer still for merit to be found in a claim that challenges a strategic decision of counsel." *Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019).

The state court reasonably concluded that counsel made a strategic decision to forgo a stand-your-ground motion. Counsel testified at the evidentiary hearing that he decided against such a motion for several reasons, including that (1) "it would [] reveal completely what our strategy and defense would have been," and (2) Brunette "would have needed to testify" at a stand-your-ground hearing "because there were no other witnesses," and the prosecution "would have been able to use his testimony . . . as substantive evidence" at trial. (Doc. 12-2, Ex. Z, p. 41.) The record thus supports the

16

state court's conclusion that counsel made an informed, strategic decision not to file a stand-your-ground motion. *See Brown v. Fla. Dep't of Corr.*, No. 22-cv-60645, 2023 WL 2734227, at *6 (S.D. Fla. Mar. 31, 2023) (holding that trial counsel made "strategic decision[]" to forgo stand-your-ground motion based on concerns about "potential prejudice [p]etitioner would face if his testimony were used at a later trial"); *Boyington v. Sec'y, Fla. Dep't of Corr.*, No. 3:18-cv-810-BJD-MCR, 2021 WL 719644, at *4-5 (M.D. Fla. Feb. 24, 2021) ("When counsel made a strategic decision not to raise the Stand Your Ground immunity issue prior to trial, he based it on the state of the law at the relevant time, and he knew and understood the Stand Your Ground law and made a strategic decision not to raise the matter pre-trial."); *Jackson v. Fla. Dep't of Corr., Sec'y*, No. 5:16-cv-301-LC-CJK, 2018 WL 3433300, at *9 (N.D. Fla. June 12, 2018) ("[T]he state court reasonably concluded that counsel's failure to file the motion to dismiss petitioner now proposes was a strategic decision made after thorough investigation of the facts and careful, reasonable consideration of the advantages and disadvantages of moving to dismiss the charge on Stand Your Ground immunity."), *adopted by* 2018 WL 3430694 (N.D. Fla. July 16, 2018).

Moreover, even on *de novo* review, the ineffective-assistance claim would fail for lack of prejudice.[5]  Had Brunette filed a stand-your-ground motion, he would have had

---

[5] Because the state court "found the representation adequate, [it] never reached the issue of prejudice, and so [this Court] examine[s] this element of the *Strickland* claim *de novo*." *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *see also Ferrell v. Hall*, 640 F.3d 1199, 1224 (11th Cir. 2011) ("[Where] the state court has denied the petitioner's claim on only one prong of the *Strickland* test . . . we review *de novo* the prong that the state court never reached.").

to prove "by a preponderance of the evidence" that he was immune from prosecution.[6] *See State v. Gallo*, 76 So. 3d 407, 409 & n.2 (Fla. 2d DCA 2011). As noted above, Brunette argued self-defense at trial, "where the state had the greater burden of showing beyond a reasonable doubt that [Brunette] did *not* act in self-defense." *Briner v. Sec'y, Dep't of Corr.*, No. 6:15-cv-1117-PGB-TBS, 2018 WL 560609, at *4 (M.D. Fla. Jan. 25, 2018) (citing *Fields v. State*, 988 So. 2d 1185, 1186 (Fla. 5th DCA 2008)). The prosecution met its burden at trial, and Brunette was convicted of second-degree murder. "Given that the state was able to prove beyond a reasonable doubt that [Brunette] was not legally justified in his use of force, [he] has not met his burden of showing *Strickland* prejudice from" trial counsel's failure to file a stand-your-ground motion. *Id.*; *see also Roberts v. Sec'y, DOC*, No. 2:18-CV-501-JES-NPM, 2021 WL 2315070, at *5 (M.D. Fla. June 7, 2021) (state court reasonably rejected *Strickland* claim based on failure to file stand-your-ground motion because petitioner raised self-defense at trial, and his "testimony failed to even raise a reasonable doubt of [his] guilt in the minds of the jurors").

For all of these reasons, Ground Two is denied.

---

[6] After Brunette's trial, the Florida legislature amended the stand-your-ground statute. "In light of the 2017 amendment, a defendant is no longer required to prove that he or she acted in self-defense by a preponderance of the evidence at an immunity hearing; instead, a defendant need only make a prima facie showing at that point. To defeat the claim of immunity, the State must prove by clear and convincing evidence that the defendant did not act in self-defense." *Boston v. State*, 326 So. 3d 673, 675 (Fla. 2021).

C.    **Ground Three**

Brunette contends that trial counsel provided ineffective assistance by "failing to have" him evaluated "by a forensic mental health expert." (Doc. 1, p. 8.) Brunette claims that, following his arrest, he was diagnosed with post-traumatic stress disorder ("PTSD") in "the county jail." (*Id.*) The psychologist who diagnosed Brunette allegedly concluded that his PTSD stemmed from "the shooting incident" involving Hampton. (Doc. 12-1, Ex. U, p. 18.) Brunette appears to maintain that an expert could have testified that his PTSD explained his "actions after the shooting."[7] (Doc. 1, p. 8.)

Following an evidentiary hearing, the state court rejected Brunette's ineffective-assistance claim:

> [T]he Defendant alleges that trial counsel was ineffective for failing to employ the services of [a] mental health expert. Specifically, the Defendant claims counsel should have had the Defendant evaluated for posttraumatic stress disorder (PTSD) to assist in his defense by explaining the Defendant's behavior after the victim was shot.
>
> The Defendant testified at the hearing that he was diagnosed with PTSD and that counsel could have had a psychiatrist come to see the Defendant and evaluate him. However, the Defendant claim[s] he never told his attorney that he had been diagnosed with PTSD, because counsel did not spend enough time with the Defendant to even get to know such facts. Regardless, the Defendant argues that had counsel pursued such evaluation, this evidence could have been used at trial and would have assisted in his defense. The Defendant argues that PTSD would have explained the Defendant's behavior after the shooting and that a mental health expert could have presented this to the jury.

---

[7] During an interview with law enforcement, Brunette stated that he spent three years in the Army as a "[n]uclear biological chemical specialist," and that he "stayed stateside" during his military service. (Doc. 12-1, Ex. C, pp. 445-46.) Brunette does not contend that his PTSD stemmed from his time in the Army.

[Counsel] testified that he did speak with the Defendant about PTSD, but that he never himself believed that an expert was necessary to evaluate the Defendant for the same, nor use PTSD as part of the defense. [Counsel] testified that the facts and circumstances, as claimed by the Defendant, did not necessitate an expert. [Counsel] testified that the facts indicated that the Defendant planned to commit a robbery with the victim on the night in question. The victim revealed that the person they were going to rob was the Defendant's friend. The Defendant did not want to rob his friend, so an altercation ensued. The victim pulled a gun, the Defendant and the victim struggled, the gun went off[,] and the victim was shot. [Counsel] testified that the events that took place after the shooting, including the decision to bury the victim's body in the woods, were planned by the Defendant's friend—not the Defendant. Therefore, [counsel] testified that using PTSD as part of the defense, to explain the Defendant's actions after the shooting, would have been inconsistent; the Defendant merely followed the plan devised by a friend. The evidence suggests that the friend was setting the Defendant up, as the friend gave the Defendant a shovel, left the Defendant, and then called the police. Therefore, [counsel] did not seek the assistance of a mental health expert in preparing the Defendant's case for trial.

Based on the testimony, the Court finds that [counsel] was unaware that the Defendant had ever been diagnosed with PTSD, but that [counsel] specifically recalled discussing PTSD with the Defendant. [Counsel] made a strategic decision not to have the Defendant evaluated by a mental health expert because he believed that using a diagnosis of PTSD as part of his defense would have been inconsistent. The Court finds no deficiency in counsel's performance with respect to this decision. Therefore, [this ground] is denied.

(Doc. 12-2, Ex. AA, pp. 4-5.)

The state court reasonably rejected this ineffective-assistance claim. Informed, strategic choices about which defense to pursue are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Moreover, "constitutionally sufficient assistance of counsel does not require presenting an alternative—not to mention unavailing or inconsistent—theory of the case." *Dill v. Allen*, 488 F.3d 1344, 1357 (11th Cir. 2007). Courts "will not find ineffective assistance of counsel simply because a petitioner's

counsel failed to chronicle every possible theory of the relevant facts." *Id.*; *see also Chandler v. United States*, 218 F.3d 1305, 1318 (11th Cir. 2000) ("[C]ounsel's reliance on particular lines of defense to the exclusion of others—whether or not he investigated those other defenses—is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable.").

Here, counsel testified that, based on his discussions with Brunette, he believed the plan to cover up the shooting came from Wilson, Brunette's friend. Counsel stated that, because the idea to "get rid of the body" and "clean the vehicle" was "somebody else's plan," he did not pursue the theory that PTSD could explain Brunette's post-shooting conduct. (Doc. 12-2, Ex. Z, p. 61.) Instead, counsel (1) elicited testimony from Brunette that Wilson "came to [him] with" the idea to "bury the dude" and "clean [the car] out"; and (2) emphasized during closing argument that Wilson devised the plan to cover up the shooting. (Doc. 12-1, Ex. C, pp. 512, 590-93.) Thus, the record supports the state court's conclusion that counsel "made a strategic decision not to have [Brunette] evaluated by a mental health expert because he believed that using a diagnosis of PTSD as part of his defense would have been inconsistent." (Doc. 12-2, Ex. AA, p. 5.) Because Brunette failed to show that this decision was "so egregious that no reasonably competent attorney would have acted similarly," the state court correctly concluded that counsel's performance was not deficient. *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1239 (11th Cir. 2011).

Furthermore, even on *de novo* review, the ineffective-assistance claim would fail for lack of prejudice.[8] Brunette has not presented any evidence that a mental health expert would have testified that PTSD could account for his behavior after the shooting. At the evidentiary hearing, Brunette opined that PTSD "explains everything" about his post-shooting conduct. (Doc. 12-2, Ex. Z, pp. 26-27.) Such speculation, however, is insufficient to establish prejudice under *Strickland*. *See Finch v. Sec'y, Dep't of Corr.*, 643 F. App'x 848, 852 (11th Cir. 2016) ("Without some specificity as to the proposed expert's testimony, any assertion that an expert would testify consistently with [petitioner's] claims is mere speculation and does not entitle him to habeas relief."); *Holt v. Sec'y, Fla. Dep't of Corr.*, 489 F. App'x 336, 338 (11th Cir. 2012) (holding that state court reasonably rejected *Strickland* claim based on failure to retain expert because "[i]t [was] speculative that an expert witness would in fact have testified" the way petitioner wanted); *Moore v. Sec'y, Fla. Dep't of Corr.*, No. 3:06-cv-127-MMH, 2022 WL 4133198, at *23 (M.D. Fla. Sept. 12, 2022) ("[Petitioner's] claim about the testimony of expert witnesses is speculative because he does not specify the substance of the proposed experts' testimony, and he presumes the experts would have testified favorably to the defense.").

Accordingly, Ground Three is denied.

---

[8] Because the state court did not address *Strickland*'s prejudice prong, the Court reviews that element of the claim *de novo*. *See Johnson*, 643 F.3d at 930 ("As a result of the Florida Supreme Court's decision on the performance prong and non-decision on the prejudice prong, we review the holding that counsel's performance was not deficient with AEDPA deference, but we must conduct a plenary review of whether [petitioner] was prejudiced by his counsel's failure to present non-statutory mitigating circumstances.").

**D.    Ground Four**

Brunette contends that trial counsel was ineffective for failing to "consult and present an expert in the field of crime scene reconstruction and firearms." (Doc. 1, p. 10.) He argues that such an expert would have supported his claim of self-defense by establishing that he "was being robbed by the victim and resisted." (*Id.*)

The state court denied this claim following an evidentiary hearing:

> [T]he Defendant alleges that trial counsel was ineffective for failing to consult and retain an expert in the field of crime scene reconstruction. The Defendant testified that a crime scene reconstruction expert was necessary to evaluate the physical evidence in this case. The Defendant alleges that a crime scene expert would be able to testify that the events that took place in the car, were as the Defendant had described them as— thereby confirming the Defendant's story. The Defendant claims the bullet entry wounds and the trajectory paths, the presence of self-defense wounds, and blunt force trauma were of evidentiary value in this case, and further examination by an expert, would have proved that the Defendant's version of events were [*sic*] in fact true.

> [Trial counsel] testified that he did not recall any discussion of this issue with the Defendant and that he never thought of seeking the assistance of such an expert. [Counsel] testified that based on the facts he did not think a crime scene reconstruction expert would have been of great assistance in the case. The issue was never whether there was a struggle, that the gun discharged, and the victim was shot. Nor was there any dispute about whether the victim was shot in the vehicle. The real issue was the intent of the Defendant.

> The Court finds no deficiency in counsel's representation with respect to this matter, and that even if counsel would have retained such an expert, it is unlikely that the result would have been different. There were only two people in the vehicle that night that truly knew what happened—the Defendant and the victim. Although the Defendant claims he was defending himself against the victim, as the victim had pulled a gun on him, the evidence presented at trial was inconsistent with the Defendant's assertions. First, the medical examiner testified that the victim had been shot five (5) times; once in the back of the head, twice in the chest, once in the upper arm, and one bullet grazed his skin. Her expert opinion was

that there were no injuries to indicate a struggle, such as defensive wounds or any injuries to the arms or legs. Second, the Defendant's actions after the victim was shot are inconsistent with actions of an individual who acted in self-defense. The Defendant loaded the victim's body in the truck of the victim's car, he admitted to law enforcement that he went to Dade City to sell a weapon belonging to the victim and in exchange for the weapon received [illegal drugs] and $80, he was advised by several friends—and had plenty of time—to call the cops if it was self-defense but the Defendant instead buried the victim's body in the woods, and he then poured brake fluid on the body to mask any decomposing smell. The Defendant then cleaned out the victim's vehicle and placed the victim's belongings in a garbage bag.

When weighing what the Defendant believed that a crime scene reconstruction expert could have presented to the jury to support his theory of self-defense, against the Defendant's actions after the victim was shot—which are supported by the Defendant's own testimony as well as the testimony given by the medical examiner—the Court finds it is highly unlikely that the outcome of the trial would have been different. Therefore, the Court finds that the Defendant fails to establish that he was prejudiced by counsel's failure to employ the services of an expert to analyze the crime scene and the physical evidence.

(Doc. 12-2, Ex. AA, pp. 6-7 (record citations omitted).)

The state court reasonably rejected Brunette's ineffective-assistance claim. The burden of establishing prejudice under *Strickland* "is particularly heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative." *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021). For that reason, "a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness." *Id.* Here, Brunette merely speculates that a crime scene reconstruction expert would have testified that the physical evidence supported his claim of self-defense.

Notably, he does not identify "a single [] expert who was prepared to come into court and say that." *Cardona v. Dixon*, No. 19-81567-CIV, 2022 WL 2158715, at *13 (S.D. Fla. June 14, 2022). Because there is no basis to conclude that an expert would have provided helpful testimony, the state court reasonably concluded that Brunette failed to establish prejudice. *See Duran v. Walker*, 223 F. App'x 865, 875 (11th Cir. 2007) ("[Petitioner's] claim that an expert witness would have prompted the jury to believe his testimony . . . is conclusory and speculative, and does not amount to a showing of prejudice.").

Because the state court's prejudice determination was reasonable, this Court need not address trial counsel's performance. *See Bishop v. Warden, GDCP*, 726 F.3d 1243, 1255 (11th Cir. 2013) ("We need not address counsel's performance, because, even if we were to assume that counsel were ineffective in failing to call the officers, the state court's prejudice determination was not an unreasonable one."). The rejection of Brunette's ineffective-assistance claim did not involve an unreasonable application of *Strickland*, nor was it based on an unreasonable factual determination. Accordingly, Brunette is not entitled to relief on Ground Four.

### E.    Ground Five

Brunette argues that trial counsel was ineffective for failing "to make a motion to reduce the charges/conviction from second[-]degree murder to manslaughter." (Doc. 1, p. 12.) According to Brunette, counsel should have filed such a motion because the prosecution "never introduced evidence of . . . ill will, malice, hatred,

spite, or an evil intent, which is a necessary element to warrant a conviction for second-degree murder." (*Id.*)

The state court denied this claim without holding an evidentiary hearing:

In the Defendant's fifth ground for relief, he claims trial counsel provided ineffective assistance because counsel failed to make a proper motion for a judgment of acquittal and failed to move to reduce the charge and conviction from second-degree murder to manslaughter. The Defendant argues the evidence produced at trial supported a manslaughter conviction, not a second-degree murder conviction. The Defendant urges his testimony at trial was unrebutted and the State of Florida improperly relied solely on events that occurred after the victim's death to support the conviction. He further argues the State of Florida failed to prove the necessary intent for a second-degree murder conviction (that the Defendant committed an act which was done from "ill-will, hatred, spite[,] or an evil intent, and is of such a nature that the act itself indicates an indifference to human life"). At trial, trial counsel did move for a judgment of acquittal. Trial counsel did not argue the specific grounds the Defendant now asserts in support of his request for a judgment of acquittal and counsel did not move to reduce the second-degree murder conviction to manslaughter. Counsel's failure to do so, however, was not error.

Motions to reduce a charge and motions for a judgment of acquittal are governed by the same standards. *Williams v. State,* 70 So. 3d 726, 730-32 (Fla. 4th DCA 2011). When a defendant moves for an acquittal or to reduce a charge, they admit all facts in evidence and the court draws all reasonable inferences from the evidence in the state's favor. *Id.* In this case, the court instructed the jury on both second-degree murder and manslaughter. This issue was properly presented to the jury. Although the Defendant's testimony supported a manslaughter instruction and a manslaughter conviction, the Defendant's testimony was not the only evidence presented at trial. The State of Florida presented physical evidence to the jury and argued the physical evidence was inconsistent with the Defendant's version of the events. There was disputed evidence as to the motive for the shooting, the positions of the Defendant and the victim, who was holding the gun, the manner the Defendant claimed he disarmed the victim, etc. Neither the State of Florida, nor the jury, were bound to accept the Defendant's version of the events as truthful. *See Early v. State,* 223 So. 3d 1023, 1024, 1026 (Fla. 1st DCA 2017) (citations

omitted); *Leasure v. State,* 105 So. 3d 5, 14 (Fla. 2d DCA 2012) (citations omitted).

. . .

The State of Florida argued the Defendant's testimony was "ridiculous" and "extraordinarily implausible." In addition to discounting the Defendant's testimony with the physical evidence, the State of Florida presented evidence [that]: 1) the Defendant, who was given two rides by the victim, took the victim's automobile and continued to use the victim's automobile until apprehended, 2) the Defendant turned the victim's pockets inside out, 3) the Defendant took the victim's personal property, 4) the Defendant sold one of one of the victim's guns for drugs and money, 5) the Defendant concealed the victim's personal papers and effects, 6) the Defendant concealed, and then buried, the victim's body and evidence of the crime, and 7) the Defendant failed to report the victim's death even after he told his friends he killed the victim in self-defense and his friends encouraged him to report the death and explain the extenuating circumstances to the authorities. Despite the Defendant's protestations to the contrary, it was not improper for the State of Florida to present evidence to the jury regarding the Defendant's behavior after the Defendant killed the victim. *See Blair v. State,* 406 So. 2d 1103, 1106-07 (Fla. 1981) (guilty knowledge may be shown by "acts, conduct, and declarations before, at the time of, or after the commission of a criminal act"); *Jones v. State,* 44 Fla. 74, 32 So. 793 (Fla. 1902) (same). The evidence offered by the State of Florida, and the reasonable inferences taken from that evidence, were properly presented to the jury on the issue of whether the Defendant committed the crime of second-degree murder or manslaughter. Had counsel moved to reduce the charge or conviction, the motion would have properly been denied because a "common-sense view of the evidence" supported the jury's rejection of the [D]efendant's story as unbelievable. *See Early* at 1026 (citation omitted). The Defendant's fifth claim for relief should be denied.

(Doc. 12-2, Ex. Y, pp. 4-6 (record citations omitted).)

The state court reasonably rejected Brunette's ineffective-assistance claim.

"[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension,"

a court "must defer to the state's construction of its own law when the validity of the

[ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d

1290, 1295 (11th Cir. 2017). Here, the state court found that counsel was not ineffective because, under Florida law, a motion "to reduce the charge or conviction" to manslaughter "would have properly been denied." (Doc. 12-2, Ex. Y, p. 6.) Thus, the state court "already has told us how the issue[] would have been resolved under state law had [counsel] done what [Brunette] argues he should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354-55 (11th Cir. 2005). This Court is bound to defer to that determination. *See Smith v. Sec'y, Dep't of Corr.*, No. 8:18-cv-0049-KKM-SPF, 2021 WL 1214948, at *12 (M.D. Fla. Mar. 31, 2021) ("[T]o the extent the state court concluded the motions for judgment of acquittal would have been denied, this Court is obliged to defer because that is a question of state law.").

Even if the issue were for the Court to decide, Brunette would not be entitled to relief. For the reasons explained above in connection with Ground One, the prosecution presented sufficient evidence that Brunette "acted with a depraved mind" when he shot and killed Hampton, and thus that Brunette was guilty of second-degree murder. *Perez*, 187 So. 3d at 1282. Accordingly, the state court correctly concluded that a motion to reduce the charge or conviction would have been denied. Counsel cannot be deemed deficient for failing to raise a meritless claim. *See Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance."). Ground Five is denied.

### F.   Grounds Six and Seven

In Ground Six, Brunette contends that postconviction counsel provided ineffective assistance at the evidentiary hearing because she failed to present "official visitation logs from the county jail showing trial counsel only visiting once over a two[-]year period before trial." (Doc. 1, p. 13.) In Ground Seven, Brunette maintains that postconviction counsel rendered ineffective assistance at the evidentiary hearing because she failed to present evidence establishing an alleged *Giglio*[9] violation. According to Brunette, the *Giglio* violation occurred when trial counsel "false[ly]" testified at the evidentiary hearing that he had visited Brunette "10 to 20 times at the county jail." (*Id.*, p. 14.)

Brunette raised these ineffective-assistance claims in a successive Rule 3.850 motion. (Doc. 12-2, Ex. VV, pp. 16-22.) The state court rejected Grounds Six and Seven, explaining that Brunette "ha[d] no valid claim for postconviction relief" because "there is no constitutional right to postconviction counsel." (*Id.*, Ex. WW, p. 2.) That conclusion was correct. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." (citations omitted)); *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1344 (11th Cir. 2007) ("A petitioner cannot establish constitutionally ineffective assistance of counsel in state post-conviction proceedings because there is

---

[9] *Giglio v. United States*, 405 U.S. 150 (1972).

no constitutional right to an attorney in such proceedings."); *see also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). Accordingly, Grounds Six and Seven are denied.

### G.    Ground Eight

Brunette argues that his right to due process was violated because the state postconviction court (1) failed to hold an evidentiary hearing on Ground Five (the ineffective-assistance claim based on counsel's failure to file a motion to reduce the charge or conviction); and (2) "did not state any findings of decisional law"—specifically, "U.S. Supreme Court law"—"to support his denial of Ground Five." (Doc. 1, p. 15.)

Respondent contends that this claim is procedurally defaulted because Brunette failed to properly exhaust it in state court. The Court need not decide this issue because, even assuming the claim was exhausted, it would fail on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

First, "it is beyond debate that a state court's failure to conduct an evidentiary hearing on a post-conviction motion does not constitute a cognizable claim for habeas relief." *Carroll*, 574 F.3d at 1365; *Martinez v. Sec'y, Fla. Dep't of Corr.*, No. 22-11280-E, 2022 WL 14328228, at *1 (11th Cir. July 27, 2022) ("To the extent that [petitioner] challenged the state court's failure to hold an evidentiary hearing on this claim, such a challenge is not cognizable for habeas relief."). Accordingly, Brunette is not entitled

to relief based on the state court's failure to hold an evidentiary hearing on Ground Five.

Second, contrary to Brunette's assertion, the state court was not required to cite "decisional law" or "U.S. Supreme Court law" in rejecting Ground Five. Indeed, a state-court "decision receives AEDPA deference even if the state court fails to cite— or is not even aware of—relevant Supreme Court precedent." *Greene v. Upton*, 644 F.3d 1145, 1157 (11th Cir. 2011). Instead, to overcome AEDPA deference, a petitioner must show that the state-court decision was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). As explained above, Brunette failed to make the required showing with respect to Ground Five.

Accordingly, Ground Eight is denied.

## H. Ground Nine

Finally, Brunette argues that trial counsel was ineffective for failing to seek dismissal of the charge on the grounds that a "constructive amendment" of the information occurred. (Doc. 1, p. 16.) According to Brunette, he was convicted of an "uncharged offense"—namely, manslaughter—because the evidence at trial failed to establish "ill will, hatred, evil intent, [or] malice, [] which is needed to prove second[-]degree murder." (*Id.*) Brunette contends that this amounted to a constructive amendment of the information, and that counsel should have raised the issue in a "motion[] to dismiss or reduce charges." (*Id.*)

Respondent argues that Ground Nine is unexhausted, but the Court need not reach that issue because the claim is meritless. "A constructive amendment occurs when the essential elements of the offense contained in the [information] are altered to broaden the possible bases for conviction beyond what is contained in the [information]." *United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015); *see also Stanley v. State*, 57 So. 3d 944, 947 (Fla. 4th DCA 2011) ("A constructive amendment of a charging document allow[s] the jury to convict the defendant of an offense different from or in addition to the offenses alleged in the [information]."). "The [information] can be expanded, either literally or in effect, by the prosecutor's actions or the [trial] court's instructions." *Holt*, 777 F.3d at 1261.

No constructive amendment occurred here. Brunette was charged by information with one count of second-degree murder with a firearm. (Doc. 12-1, Ex. A.) As explained above, the jury convicted him of that offense based on evidence that was sufficient to establish each element of the crime. "Because [Brunette] was charged and convicted of the same offense [], this Ground has no merit." *Hong v. Sec'y, Dep't of Corr.*, No. 5:07-cv-374-PAM, 2011 WL 13175211, at *8 (M.D. Fla. Mar. 15, 2011), *aff'd*, 478 F. App'x 648 (11th Cir. 2012). Furthermore, there is no basis to conclude that the "prosecutor's actions or the [trial] court's instructions" "broaden[ed] the possible bases for conviction beyond what [was] contained in the [information]." *Holt*, 777 F.3d at 1261. Accordingly, counsel was not ineffective for failing to raise this meritless issue. *See Freeman v. Att'y Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A

lawyer cannot be deficient for failing to raise a meritless claim."). Ground Nine is denied.

It is therefore **ORDERED** that Brunette's petition (Doc. 1) is **DENIED**. Brunette's motion requesting a ruling (Doc. 24) is **GRANTED** to the extent that this order resolves his petition. The **CLERK** is directed to enter judgment against Brunette and to **CLOSE** this case.[10]

### Certificate of Appealability<br>and Leave to Appeal *In Forma Pauperis* Denied

It is further **ORDERED** that Brunette is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a certificate of appealability must first issue. *Id.* "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To obtain a certificate of appealability, Brunette must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Brunette has not made the requisite showing.

---

[10] Brunette seeks an evidentiary hearing on his claims. The Court determines that an evidentiary hearing is not warranted. *See Schriro*, 550 U.S. at 474 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015) ("[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record.").

Finally, because Brunette is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

    **DONE** and **ORDERED** in Tampa, Florida, on July 3, 2023.

Charlene Edwards Honeywell
United States District Judge